**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EDDY TORRES, | : | |
|    Plaintiff, | : | |
| | : | CIVIL ACTION |
|      v. | : | |
| | : | NO. 14-2818 |
| CLEANNET, U.S.A., INC., et al., | : | |
|    Defendants. | : | |

February 5, 2015                                                          **Anita B. Brody, J.**

**<u>MEMORANDUM</u>**

Plaintiff Eddy Torres brings this class action against Defendants CleanNet U.S.A., Inc.

("CleanNet"), MKH Services, Inc. ("MKH"), and CleanNet Systems of Pennsylvania, Inc.

("CleanNet PA") pursuant to PA R. Civ. P. §§ 1701-16 on behalf of the following putative class:

"All persons who performed cleaning services for Defendants in Pennsylvania at any time from

April 11, 2011 to the present."  Compl. ¶ 70.  Torres originally filed this case in the Philadelphia

Court of Common Pleas.  Defendants removed this diversity class action from state court to

district court pursuant to the Class Action Fairness Act of 2005 ("CAFA").  I determined that the

action stays in federal court.  *See* ECF Nos. 37, 38.  Defendants now move to stay proceedings

pending arbitration.[1]  For the reasons set forth below, I will grant Defendants' motions to stay in

favor of arbitration.

_____

[1] Defendants move pursuant to § 3 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3.  Section 3 of the
FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any
> issue referable to arbitration under an agreement in writing for such arbitration, the court
> in which such suit is pending, upon being satisfied that the issue involved in such suit or
> proceeding is referable to arbitration under such an agreement, shall on application of one
> of the parties stay the trial of the action until such arbitration has been had in accordance

# I. BACKGROUND[2]

Defendant CleanNet is a commercial cleaning company that operates in Pennsylvania and other locations throughout the United States.  CleanNet operates in Pennsylvania through two subfranchisors ("Area Operators"), Defendants MKH and CleanNet PA.  On March 9, 2012, Torres entered into a Franchise Agreement with MKH to become a CleanNet franchisee and to perform cleaning services for CleanNet.  In the Franchise Agreement, MKH agreed to provide Torres $7,000 in gross monthly billings, if Torres paid an Initial Franchise Fee of $24,500.  The Franchise Agreement also contained Section XXII on dispute resolution.

Under Section XXII, the parties "expressly agree[d] first to resolve disputes by direct negotiation with each other."  MKH's Mot. Ex. A at 39.[3]  If those negotiations failed, the parties

---

with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.  MKH seeks only a stay whereas Defendants CleanNet and CleanNet PA ("CleanNet Defendants") seek a motion to dismiss or stay pursuant to § 3.  However, "the plain language of § 3 affords a district court no discretion to dismiss a case where one of the parties applies for a stay pending arbitration."  *Lloyd v. HOVENSA, LLC.*, 369 F.3d 263, 269 (3d Cir. 2004).  Rather, "the statute clearly states, without exception, that whenever suit is brought on an arbitrable claim, the Court 'shall' upon application stay the litigation until arbitration has been concluded."  *Id.*  Thus, the CleanNet Defendants' motion will be treated solely as a motion to stay.

In the alternative, Defendants seek a motion to compel arbitration pursuant to § 4 of the FAA, 9 U.S.C. § 4.  "However, it makes no practical difference whether the court enters an order in an ongoing suit compelling arbitration [under § 4] or merely stays its own proceedings [under § 3].  In either event, arbitration is the *sine qua non* before proceeding."  *Zosky v. Boyer*, 856 F.2d 554, 556 (3d Cir. 1988), *abrogated on other grounds by Green Tree Fin. Corp.-Alabama v. Randolph,* 531 U.S. 79 (2000).  Therefore, there is no need to address this alternative.

[2] The facts are taken from the Complaint unless otherwise noted.  Because I analyze these motions to stay under the motion to dismiss standard, I construe the factual allegations in the light most favorable to Torres.  *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772-74 (3d Cir. 2013)

[3] Torres attached to his Complaint a copy of a form franchise agreement that was not filled out, signed, or dated.  Defendant MKH attached to its motion to stay a copy of the Franchise Agreement and Addendum actually signed by Torres.  The parties do not dispute the authenticity of the Franchise Agreement and Addendum attached to MKH's motion.  Therefore, I cite to the Franchise Agreement and Addendum attached to MKH's motion.

agreed that "[b]efore and as a necessary condition precedent to, filing a demand for arbitration in accordance with this Agreement, Franchisee and Franchisor shall attempt to settle the dispute through mediation administered by the American Arbitration Association ("AAA")." *Id.* If mediation failed, the parties then agreed to adhere to the following arbitration provision:

> **Arbitration.**  All disputes, controversies, and claims of any kind arising between parties, including but not limited to claims arising out of relating to this Agreement, the rights and obligations of the parties, the sale of the franchise, or other claims or causes of action relating to the performance of either party that are unable to be settled through mediation shall be settled by arbitration administered AAA at its office closest in proximity to the Franchisor's office, in accordance with the Federal Arbitration Act and the Commercial Rules of the AAA, unless the parties otherwise agree in accordance with . . . this Agreement.
>
> * * * *
>
> The filing fee for the proceeding shall be borne by the initiating party. The arbitrator's compensation and any administrative costs shall be borne by both parties.
>
> * * * *
>
> The parties expressly agree that an arbitrator shall have the power to enter an award, including injunctive relief, protecting each parties rights to the same extent a court could do so, and such relief shall be enforceable by a court having jurisdiction under . . . this Agreement.
>
> * * * *
>
> No arbitration or action under this Agreement shall include, by consolidation, joinder, or any other manner, any claims by any person or entity in privity with or claiming through or on behalf of Franchisee.  Franchisee shall not seek to arbitrate or litigate as a representative of, or on behalf of, any person or entity, any dispute, controversy, and claim of any kind arising out of or relating to this Agreement, the rights and obligations of the parties, the sale of the franchise, or other claims or causes of action relating to the performance of either party to this Agreement.

*Id.* at 39-40.  Section XXII also included the following waiver of punitive damages provision:

> **Waiver of Punitive Damages.** FRANCHISEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT OR CLAIM FOR ANY PUNITIVE, EXEMPLARY, CONSEQUENTIAL, OR SPECULATIVE DAMAGES INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS, AND AGREES THAT IN THE[] EVENT OF A DISPUTE, FRANCHISEE SHALL BE LIMITED TO THE ACTUAL DAMAGES SUSTAINED EXCEPT AS OTHERWISE PROVIDED HEREIN.

*Id.* at 41.  Additionally, Section XXII contained the following saving clause:

> **Saving Clause.** If any provisions of this Section XXII would violate applicable state or federal laws, then the parties agree that such provision shall be excluded from the terms of this Agreement, or shall be modified to the minimum extent necessary to make the terms hereof lawful.

*Id.*

MKH failed to provide Torres with the guaranteed $7,000 in monthly billings.  On August 31, 2012, Torres and MKH executed an Addendum to the Franchise Agreement to downgrade the gross monthly billings from $7,000 to $3,000.  In the Addendum, the parties continued to abide by Section XXII of the Franchise Agreement:  "The parties agree that any action brought by or against Franchisee or Franchisor in connection with this Addendum of the Franchise Agreement, or any other dispute arising between Franchisor and Franchise, shall be resolved in accordance with the dispute resolution procedures contained in the Franchise Agreement."  *Id.* at 5.

From September 2012 through June 2013, CleanNet failed to provide Torres with $3,000 in gross monthly billings as required by the August 31, 2012 Addendum to the Franchise Agreement.  In June 2013, Torres sought a refund of the Initial Franchise Fee that he paid in March 2012, as modified by the August 31, 2012 Addendum.  On June 11, 2013, CleanNet refused to issue a refund.

4

Torres brings suit on behalf of himself and "[a]ll persons who performed cleaning services for Defendants in Pennsylvania at any time from April 11, 2011 to the present." Compl. ¶ 70. "Collectively, these Defendants [MKH, CleanNet PA, and CleanNet] operate as joint employers of Plaintiff and the [putative] Class, and are uniformly controlled by the President of CleanNet." *Id.* ¶ 3. CleanNet offers cleaning franchises to individuals, pursuant to which the individuals enter into a standard form Franchise Agreement. CleanNet classified Torres and other franchisees as independent contractors. However, "[t]hrough its system and the Franchise Agreement, CleanNet controls every aspect of the janitorial services rendered by Plaintiff and the [putative] Class." *Id.* ¶ 48. CleanNet controls the manner and method of services, the schedule of service, the rates of pay, gross monthly billings, the type of cleaning equipment and supplies to be used, and the amount that can be charged to a client. CleanNet also requires Torres and members of the putative class to purchase a variety of insurances, sets minimum limits for these coverages, and requires CleanNet and the Area Operator (either MKH or CleanNet Pa) to be named as additional insured at the expense of Torres and the putative class members.

Furthermore, CleanNet performs billing and collection services, and deducts its fees from the wages earned by Torres and the putative class members based on the monthly gross billings, regardless of whether Torres and the putative class members have been paid by the account. CleanNet charges Torres and members of the putative class 5% of gross monthly billings as an Administrative Fee to perform all billing and collection services. Even if a member of the putative class chooses not to use CleanNet's billing and collection services, the Administrative Fee is only reduced 1% (from 5% to 4%), and the putative class member must purchase special accounting software selected by CleanNet.

While CleanNet allows Torres and members of the putative class to accept or reject an assignment, all assignments whether accepted or rejected are counted toward CleanNet's fulfillment of its obligation to provide monthly gross billings.  However, many of these assignments are geographically inconvenient, too large to service, too small to be worth the time taken to get to the account, or economically infeasible.  "CleanNet routinely assigns cleaning accounts that they know the [putative] Class members are unable to accept in an effort to satisfy their Monthly Gross Billings requirements."  *Id.* ¶ 39.

Torres alleges that CleanNet intentionally misrepresents the terms of the relationship between CleanNet and members of the putative class, and targets individuals with limited fluency in English.  Torres alleges that CleanNet has "devised a clever employment relationship" that misclassifies Plaintiff and members of the putative class as independent contractors.  *Id.* ¶ 1. CleanNet operates in Pennsylvania through MKH and CleanNet PA who are "its agents and joint employers located in Pennsylvania."  *Id.* ¶ 25.  According to Torres, "Defendants purport to contract with, but in reality, employ Plaintiff and the [putative] Class members to perform janitorial services for CleanNet clients."  *Id.* ¶ 28.  "The basis of this misclassification arises from CleanNet's orchestrated scheme to enlist its employees as franchisees, classify these employees as independent contractors, and evade the obligations of an employer under Pennsylvania law. "  *Id.* ¶ 2.

Torres brings causes of action on behalf of himself and the putative class members under Pennsylvania statutory and common laws.  Torres brings causes of action under the Pennsylvania Minimum Wage Act of 1968, 43 P.S. § 333.101 *et seq.*, the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 *et seq.*, and the Pennsylvania Workman's Compensation Act, 73

P.S. § 501(a)(d), based on Defendants' alleged improper denial of employee wages and benefits.

Torres also brings a claim of unjust enrichment, alleging that Defendants have been unjustly

enriched by misclassifying putative class members as independent contractors.  Additionally,

Torres brings a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection

Law, 73 P.S. § 201 *et seq.*, on the basis that Defendants engaged in "deceptive conduct that

creates a likelihood of confusion or misunderstanding in connection with the Franchise

Agreement and the misclassification scheme."  *Id.* ¶ 131.  Furthermore, Torres seeks rescission

of the Franchise Agreement because he alleges that it is an unconscionable contract of adhesion

that is void against public policy.  Lastly, pursuant to the Declaratory Judgments Act, 42 Pa. C.S.

§ 7531 *et seq.*, Torres seeks declaratory relief "that will settle the controversy relating to the

employment status of Plaintiff and the Class in connection with the services rendered to

Defendants pursuant to the form Franchise Agreement."  *Id.* ¶ 84.

      In May 2014, after Torres filed suit, Defendants initiated mediation with the AAA.  Decl.

of Martha J. Keon; MKH's Mot. Exs. B, D.  Torres refused to comply with the dispute resolution

procedures in the Franchise Agreement and Addendum.  Thus, Defendants filed their motions to

stay proceedings in favor of arbitration

## II.  LEGAL STANDARD

      When reviewing a motion to stay proceedings in favor of arbitration, a district court may

either employ the motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) or

the motion for summary judgment standard under Federal Rule of Civil Procedure 56.  *Guidotti*

*v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773-76 (3d Cir. 2013).  "[W]hen it is

apparent, based on the face of a complaint, and documents relied upon in the complaint, that

certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay." *Id.* at 776 (internal quotation marks omitted).  Defendants' motions to stay proceedings in favor of arbitration will be decided under the motion to dismiss standard because whether Torres' claims are subject to arbitration is a determination that can be made solely based on the Complaint and the Franchise Agreement relied upon in the Complaint.

In deciding a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks omitted).

To survive dismissal, a complaint must allege facts sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.  However, an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered . . . ." *In re*

*Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis omitted) (citations omitted) (internal quotation marks omitted).  Thus, a court may "consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case."  *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994).  Further, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

## III.  DISCUSSION

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, "creates a body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes."  *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 522 (3d Cir. 2009).  "In particular, the FAA provides that as a matter of federal law '[a] written provision' in a maritime or commercial contract showing an agreement to settle disputes by arbitration 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist in law or in equity for the revocation of any contract.'"  *Id.* (quoting 9 U.S.C. § 2).  "Congress designed the FAA to overrule the judiciary's longstanding reluctance to enforce agreements to arbitrate and its refusal to put such agreements on the same footing as other contracts, and in the FAA expressed a strong federal policy in favor of resolving disputes through arbitration."  *Id.* (citations omitted).

"The strong federal policy favoring arbitration, however, does not lead automatically to the submission of a dispute to arbitration upon the demand of a party to the dispute."  *Id.* at 523. "Because arbitration is a matter of contract, before compelling arbitration pursuant to the Federal Arbitration Act, a court must determine that (1) an enforceable agreement to arbitrate exists, and

(2) the particular dispute falls within the scope of that agreement." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir.2009) (citation omitted).  Moreover, the "presumption in favor of arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties."  *Id.* (internal quotation marks omitted).

Defendants move to stay this litigation in favor of arbitration.  They contend that the arbitration agreement in the Franchise Agreement compels Torres to submit his claims against them to arbitration.  Torres argues that the arbitration agreement is unenforceable because it prevents Torres from effectively vindicating his state statutory rights.  Additionally, he argues that even if the court rejects his vindication argument, only MKH can enforce the arbitration agreement because it is a signatory to the Franchise Agreement, but CleanNet and CleanNet PA ("CleanNet Defendants") cannot enforce the agreement to arbitrate because they are not signatories to the Franchise Agreement.  Moreover, while Torres concedes that his dispute with MKH falls within the scope of the arbitration agreement, he contests that his dispute with CleanNet Defendants falls within the scope of the agreement.  Lastly, Torres argues that, even if the arbitration agreement requires Torres to arbitrate all of his claims against Defendants, before this Court stays litigation in favor of arbitration, it should determine the availability of classwide arbitration.  For the reasons discussed below, the arbitration agreement compels Torres to arbitrate his claims against Defendants on an individual basis.

**A.  Effective Vindication of State Statutory Rights**

Torres argues that the arbitration agreement is unenforceable because it prevents him from effectively vindicating his state statutory rights[4] by: (1) requiring him to pay the filing fee

---

[4] Torres does not bring any federal claims.  The Background section above outlines the state statutory claims brought by Torres.

and half of the arbitrator's fees and costs even though he cannot afford these fees and costs; (2) precluding recovery of statutory attorneys' fees and costs; (3) precluding recovery of all available statutory damages; and (4) limiting discovery.  CleanNet Defendants respond that the Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011) clarified that vindication of state statutory rights is not a legitimate basis for invalidating an arbitration agreement.[5]

Recent Supreme Court cases confirm that there is absolutely no rule that prevents arbitration when a person cannot effectively vindicate his or her state statutory rights.  On several occasions, the Supreme Court in dictum has asserted the existence of the "effective vindication" rule, but it has done so solely to address whether arbitration prevents a plaintiff from effectively vindicating a federal statutory right.  *See Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310-11 (2013); *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273-74 (2009); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 (1985).  Most recently, in *Italian Colors*, the Supreme Court explained that the effective vindication rule only applies to prevent arbitration of a federal statute in the limited circumstance where an arbitration agreement prohibits the assertion of a federal statutory right and "would perhaps [apply to] filing and administrative fees attached to arbitration that are so high as to make access to the forum impracticable."  133 S. Ct. at 2310-11.  The Court clarified that the effective vindication rule does not apply to prevent

---

[5]CleanNet Defendants argue that the proper method to raise such concerns is on the basis that they render the arbitration agreement unconscionable under state law.  MKH argues that Torres has not demonstrated that the agreement is unconscionable.  Torres states:  "Plaintiff is not raising an unconscionability argument.  Instead, Plaintiff's argument is that the arbitration provision precludes Plaintiff from effectively vindicating his statutory rights."  Pl.'s Omnibus Surreply 1.

arbitration of claims that are "not worth the expense involved in *proving* a statutory remedy." *Id.* at 2311.  In dissent, Justice Kagan vigorously rejected this very narrow interpretation of the effective vindication rule.  In doing so, however, she flatly rejected the possibility that the effective vindication rule applies to state statutory rights.

Without mincing words, Justice Kagan explained that the Supreme Court "ha[s] no earthly interest (quite the contrary) in vindicating [state] law." *Italian Colors*, 133 S. Ct. at 2320 (Kagan, J., dissenting).  Justice Kagan relied on *AT&T Mobility* to prove that effective vindication of state statutory rights does not exist.  As she noted, in *AT&T Mobility*, the Supreme Court never mentioned the effective vindication rule and a prime reason it did not do so is because "*AT&T Mobility* involved a *state* law, and therefore could not possibly implicate the effective-vindication rule."  *Id.*  Rather, the Court concluded in *AT&T Mobility* that the FAA preempts any state law that stands as an obstacle to the accomplishment of the FAA's objectives. *AT&T Mobility*, 131 S. Ct. at 1748, 1753.  This is because the "Supremacy Clause requires its invalidation." *Italian Colors*, 133 S. Ct. at 2320 (Kagan, J., dissenting); *see also Ferguson v. Corinthian Colleges, Inc.*, 733 F.3d 928, 936 (9th Cir. 2013) (agreeing with Justice Kagan that the Supremacy clause mandates that the FAA preempt contrary state law because "[t]he central premise of the Supremacy Clause is that federal law is superior to state law").

Thus, the "effective-vindication rule comes into play only when the FAA is alleged to conflict with another federal law . . . .  In that all-federal context, one law does not automatically bow to the other, and the effective-vindication rule serves as a way to reconcile any tension between them." *Italian Colors*, 133 S. Ct. 2320 (Kagan, J., dissenting).  The effective vindication rule would serve no purpose if applied to state statutes and would conflict with the

Supremacy Clause.  Even Justice Kagan, a strong proponent of a broad interpretation of the effective vindication rule, recognizes that it simply should not and does not apply to state statutes.  Justice Kagan's conclusion that the effective vindication rule is inapplicable to state statutes is consistent with the decisions of several lower courts.  *See, e.g., Ferguson*, 733 F.3d at 935-36 (concluding that the effective vindication rule does not apply to state statutes); *Stutler v. T.K. Constructors, Inc.*, 448 F.3d 343, 346 (6th Cir. 2006) (same); *Cohen v. USB Fin. Servs.*, No. 12-2147, 2012 WL 6041634, at *5 (S.D.N.Y. Dec. 4, 2012) (same); *McKenzie Check Advance of Florida, LLC v. Betts*, 112 So. 3d 1176, 1185-87 (Fla. 2013).[6]

Because the effective vindication rule does not apply to state statutes, Torres cannot prevail on his argument that the arbitration agreement is unenforceable because it prevents him from effectively vindicating his state statutory rights.

**B. CleanNet Defendants Enforcement of the Arbitration Agreement**

Torres also argues that CleanNet Defendants cannot enforce the agreement to arbitrate because they are not signatories to the Franchise Agreement.  CleanNet Defendants respond that as non-signatories to the Franchise Agreement they may enforce the arbitration agreement against Torres, who is a signatory, on the basis of equitable estoppel.

A non-signatory to a contract may bind a signatory to arbitrate a dispute when "traditional principles of state law allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel."  *Arthur Andersen LLP v. Carlisle*, 556

---

[6] In *Kristian v. Comcast Corp.*, 446 F.3d 25 (1st Cir. 2006) and *Booker v. Robert Half Int'l, Inc.*, 413 F.3d 77 (D.C. Cir. 2005), the Courts of Appeals applied the effective vindication analysis to state statutory claims.  These opinions are of little value, however, because they were written prior to the Supreme Court's decisions in *AT&T Mobility* and *Italian Colors*.

U.S. 624, 631 (2009) (internal quotation marks omitted).  "In the wake of *Arthur Andersen* . . .

we must expressly consider whether the relevant state contract law recognizes the particular

principle as a ground for enforcing contracts [by or] against third parties."  *Flintkote Co. v. Aviva*

*PLC*, 769 F.3d 215, 220 (3d Cir. 2014) (internal quotation marks omitted).

      Pennsylvania law embraces the theory of equitable estoppel.  *Griswold v. Coventry First*

*LLC*, 762 F.3d 264, 271 (3d Cir. 2014) (citing *Dodds v. Pulte Home Corp.*, 909 A.2d 348, 351

(Pa. Super. Ct. 2006)).  Torres and CleanNet Defendants agree that equitable estoppel is a viable

theory that enables a non-signatory to compel a signatory to arbitrate.  They disagree, however,

on the elements required to establish equitable estoppel.

      In *Griswold*, the Third Circuit set forth the elements a non-signatory must establish in

order to enforce an arbitration agreement on the basis of equitable estoppel.  The Third Circuit

relied on Pennsylvania law to conclude that under the principle of equitable estoppel:

> courts have bound a signatory to arbitrate with a non-signatory "at the
> nonsignatory's insistence because of 'the close relationship between the entities
> involved, as well as the relationship of the alleged wrongs to the non [-
> ]signatory's obligations and duties in the contract ... and [the fact that] the claims
> were intimately founded in and intertwined with the underlying contract
> obligations.'"

*Griswold*, 762 F.3d at 272 (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber &*

*Resin Intermediates, S.A.S.,* 269 F.3d 187, 199 (3d Cir. 2001)).[7]  Thus, in order for equitable

estoppel to apply, a non-signatory must establish that: (1) a close relationship exists between the

entities involved; and (2) the claims against it are "intimately founded in and intertwined with

the underlying contractual obligations."  *Id.*

---

[7] Although *E.I. Dupont* depended on opinions of other federal courts, rather than on state law, the Third
Circuit concluded that it could rely on pre-*Arthur Andersen* decisions based on federal law so long as they
were "consistent with relevant state law contract principles."  *Griswold*, 762 F.3d at 272 n.6.

Torres concedes that a close relationship exists between the entities involved. The parties dispute whether the claims against CleanNet Defendants are intimately founded in and intertwined with the Franchise Agreement.

"Claims are intertwined with an arbitration agreement when the signatory's claims 'rely on the terms of the agreement or assume the existence of, arise out of, or relate directly to, the written agreement.'" *Booth v. BMO Harris Bank, N.A.*, No. 13-5968, 2014 WL 3952945, at *6 (E.D. Pa. Aug. 11, 2014) (quoting *Sarl v. A.M. Todd Co.*, No. 07–2727, 2008 WL 724607, at *9 (E.D. Pa. Mar. 18, 2008)); *accord Bannett v. Hankin*, 331 F. Supp. 2d 354, 359-60 (E.D. Pa. 2004). The crux of Torres' Complaint is that Defendants misclassified him as an independent contractor rather than an employee. Torres argues that the claims against CleanNet Defendants are not intertwined with the Franchise Agreement because the Franchise Agreement has no impact on the determination of his employment status. The Complaint, however, states: "Defendants have misclassified Plaintiff and the Class members as independent contractors relying on the terms of a form Franchise Agreement." Compl. ¶ 81. Moreover, the Complaint alleges: "Through its system and Franchise Agreement, CleanNet controls every aspect of the janitorial services rendered by Plaintiff and the Class." *Id.* ¶ 48. Thus, Torres relies on the terms of the Franchise Agreement to prove that he should have been characterized as an employee rather than an independent contractor. *See, e.g., Southerland v. Corporate Transit of Am.*, No. 13-14462, 2014 WL 4906891, at *1, 5 (E.D. Mich. Sept. 30, 2014) (holding that the plaintiff's claims that he was misclassified as an independent contractor and thereby denied minimum wage and overtime were intertwined with the independent contractor agreement because "the issues raised by plaintiff in this case [were] explicitly addressed by the . . . Agreement."); *Kairy v.*

*Supershuttle Int'l, Inc.*, No. 08-2993, 2012 WL 4343220, at *6 (N.D. Cal. Sept. 20, 2012)

(reasoning that the franchise agreements "clearly govern all aspects of the plaintiffs' relationship

with [the defendant], including their claims that they were employees rather than independent

contractors" (internal quotation marks omitted)).

      Additionally, the Complaint is rife with references to the Franchise Agreement and its

terms, proof that Torres' claims arise out of and relate to the Franchise Agreement.[8]

Furthermore, it is readily apparent how each cause of action relies upon and relates to the

Franchise Agreement.  In Count I, Torres seeks declaratory relief to "settle the controversy

relating to the employment status of Plaintiff and the Class in connection with the services

rendered to Defendants pursuant to the form Franchise Agreement."  Compl. ¶ 84.  In Count II,

Torres seeks rescission of the Franchise Agreement because he alleges it is "void as against

public policy and therefore unenforceable."  *Id.* ¶ 91. In Count V, Torres argues that Defendants

have been unjustly enriched by the illegal Franchise Agreement, and seeks a constructive trust as

to the fees collected under it.  In Counts III, IV, and VII, Torres seeks to compel payment of

minimum wages and overtime, the required employer tax contributions to deductions and

withholdings from wages, and worker's compensation; and to compel reimbursement for

improper fees and insurance premiums paid by franchisees.  Torres alleges that he is entitled to

the recovery he seeks in Counts III, IV, and VII because the terms of the Franchise Agreement

demonstrate that Defendants exerted complete control over their franchisees and thus establishes

that Defendants misclassified franchisees as independent contractors rather than employees.

Lastly, in Count VI, Torres seeks a finding that Defendants violated Pennsylvania's Unfair Trade

---

[8] Torres relies on the Franchise Agreement in over forty paragraphs of his Complaint.  *See.* Compl. ¶¶ 6,
8-18, 29-32, 34-38, 41-48, 81, 83-85, 87, 90-93, 99, 107, 114, 116, 126, 131.

Practices and Consumer Protection Law through "deceptive conduct that create[d] a likelihood of confusion or misunderstanding in connection with [the] Franchise Agreement." *Id.* ¶ 131.

All of the claims in the Complaint stem from the franchisor/franchisee relationship established by the Franchise Agreement and thus are intimately founded in and intertwined with the Franchise Agreement. Therefore, equitable estoppel empowers CleanNet Defendants to enforce the arbitration agreement.

## C. Scope of the Agreement

Torres argues that, even if an enforceable agreement to arbitrate exists as to all Defendants, the claims against CleanNet Defendants are not arbitrable because they are not within the scope of the arbitration agreement. The arbitration clause in the Franchise Agreement requires arbitration of "[a]ll disputes, controversies, and claims of any kind *arising between parties*." MKH's Mot. Ex. A at 39 (emphasis added). Torres contends that the claims against CleanNet Defendants are outside the scope of the arbitration agreement because CleanNet Defendants status as non-signatories means that his lawsuit against them is not a dispute, controversy, or claim between parties to the Franchise Agreement.

There is no reason to address Torres' argument because, as CleanNet Defendants point out, the Addendum to the Franchise Agreement modifies the arbitration clause to require arbitration of "*any action brought by* or against *Franchisee* or Franchisor in connection with this Addendum or the Franchise Agreement." *Id.* at 5 (emphasis added). Torres does not contest that this is an action brought by the franchisee in connection with the Addendum or the Franchise Agreement. Therefore, Torres' claims against CleanNet Defendants fall within the scope of the arbitration agreement.

**D.  Classwide Arbitration**

Lastly, Torres contends that, even if the arbitration agreement requires Torres to arbitrate all of his claims against Defendants, before this Court stays litigation in favor of arbitration, it should determine the availability of classwide arbitration.  The Third Circuit has held that "whether an agreement provides for classwide arbitration is a 'question of arbitrability' to be decided by the District Court."  *Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326, 332 (3d Cir. 2014).

Torres contends that this Court should hold that the arbitration agreement provides for classwide arbitration.  Defendants oppose classwide arbitration on the basis that the arbitration agreement contains a class action waiver.  The class action waiver provides:

> No arbitration or action under this Agreement shall include, by consolidation, joinder, or any other manner, any claims by any person or entity in privity with or claiming through or on behalf of Franchisee.  Franchisee shall not seek to arbitrate or litigate as a representative of, or on behalf of, any person or entity, any dispute, controversy, and claim of any kind *arising out of or relating to this Agreement, the rights and obligations of the parties*, the sale of the franchise, or other claims or causes of action relating to the performance of either party to this Agreement.

MKH's Mot. Ex. A at 39-40 (emphasis added).  Torres argues that the class action waiver does not cover his lawsuit against Defendants because it is not a dispute "arising out of or relating to th[e] Agreement."  There is no need to address Torres' argument because, as CleanNet Defendants point out, the class action waiver also covers disputes "arising out of or relating to . . . the rights and obligations of the parties."  Torres does not contest that this lawsuit is about his rights and that he is a party to the Franchise Agreement. Moreover, "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so."  *Stolt-*

*Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010). There is absolutely no contractual basis from which to conclude that the parties agreed to class arbitration. Therefore, the class action waiver prevents classwide arbitration, and Torres must arbitrate his claims on an individual basis.

## IV. CONCLUSION

For the reasons set forth above, I will grant Defendants' motions to stay in favor of arbitration, and order Torres to follow the dispute resolution procedure in the Franchise Agreement, consisting first of mediation, and if that is unsuccessful, then individual arbitration.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:      Copies **MAILED** on _____ to: